FILED & JUDGMENT ENTERED
Steven T. Salata

May  10  2018

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_Laura T Beyer_
Laura T. Beyer
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 15-50154 |
| **Genevieve Frances Belding-Miller** ) | Chapter 7 |
| ) | |
| **Debtor.** ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## ORDER GRANTING SANCTIONS FOR WILLFUL VIOLATIONS
## OF THE DISCHARGE INJUNCTION

This matter is before the court on the motion of former debtor, Genevieve Frances Belding-Miller, that alleges Brian Cramer and his attorney, John Hanzel of John F. Hanzel, P.A., violated the discharge injunction imposed by 11 U.S.C. § 524(a)(2). Cramer, through Hanzel, attempted to collect a prepetition debt by initiating an action in state court. The debt at issue was not scheduled in Belding-Miller's bankruptcy petition. Nonetheless, the debt was discharged because Cramer had actual knowledge of Belding-Miller's bankruptcy in time to participate in her case. Because Cramer and Hanzel continued to pursue their collection efforts in state court with knowledge of Belding-Miller's discharge, the Court finds Cramer and Hanzel committed willful violations of 11 U.S.C. § 524 and awards Belding-Miller damages and attorney's fees.

## Background

Belding-Miller first met Cramer approximately fifteen years ago through her former boyfriend and child's father, Tony Zorn. Cramer and Zorn worked together at an automobile dealership and still work at the dealership today, Zorn as the finance director and Cramer in sales. Cramer, Belding-Miller, and Zorn grew to become friends and, eventually, business associates.

Belding-Miller was the sole member manager of Bri-Z 2, LLC (the LLC) which owned a tanning and hair salon. Though their romantic relationship ended in 2012, Belding-Miller and Zorn operated the salon together. To expand the services of the salon, Belding-Miller and Zorn sought funds from Cramer. Between May 2012 and March 2013, Cramer loaned $40,000 to the LLC. Within a year of Cramer making the loans, the salon closed. In the time since, Cramer received only minimal payments on his loan from Zorn and none from Belding-Miller.[1]

Though Cramer's loan was never repaid, he and Belding-Miller remained friends. They met socially several times a month. Cramer would regularly visit Belding-Miller at the bar where she worked. Belding-Miller bought a car from the dealership where Cramer works.

Belding-Miller's financial situation began to deteriorate after the salon closed. Her car was repossessed by Cramer's employer. She discussed her difficulties repaying her debts with Cramer on numerous occasions. In fact, for a year, Belding-Miller's financial distress and the possibility of her filing bankruptcy was almost all she and

---

[1] Zorn filed a Chapter 13 bankruptcy on June 4, 2012 (Case Number 12-50604). His case was completed in June 2017.

2

Cramer talked about. They discussed the cost of filing bankruptcy, Belding-Miller saving money to file, using her tax return to pay the fees, and which attorney she should hire.

Belding-Miller eventually filed a Chapter 7 bankruptcy on March 20, 2015.[2] Because she was not a personal guarantor of the debt owed by the LLC to Cramer, Belding-Miller did not include Cramer as a creditor in her personal bankruptcy.[3] The Court entered a discharge in Belding-Miller's case on June 22, 2015.

Cramer's and Belding-Miller's friendship eventually ended. Belding-Miller insinuated that they were no longer friends because she rejected Cramer's attempt to date her. Cramer denied those assertions. In any event, it does not appear that the LLC's (or Belding-Miller's) failure to repay Cramer caused their friendship to end.

On October 18, 2016, approximately one month after what Belding-Miller described as an awkward encounter with Cramer, Cramer (through attorney John Hanzel) filed a lawsuit against Belding-Miller and Zorn to collect on the prepetition loan made to the LLC (the State Court Case).[4] That action seeks damages for breach of contract, unjust enrichment, fraud, civil conspiracy, unfair and deceptive practices, and conversion. If proven true, many of the allegations in the State Court Case could result in the types of non-dischargeable debts contemplated by 11 U.S.C. § 523(a)(2), (4), and (6). In her answer to Cramer's complaint, dated December 28, 2016, Belding-Miller asserted, *inter*

---

[2] In the initial bankruptcy proceedings up through discharge, Belding-Miller was represented by attorney James Mallory.

[3] Zorn, likewise, did not list Cramer in his bankruptcy.

[4] The State Court Case is captioned *Brian Cramer vs. Genevieve Belding-Miller and Tony Zorn* and bears case number 16-CVS-18927.

3

*alia*, that all the debts were discharged in her bankruptcy.[5] For the next seven months, it appears that the State Court Case moved through the various stages of pre-trial litigation. A mediation occurred, but did not result in a settlement.

Prior to a trial in state court, by letter dated May 30, 2017, Belding-Miller demanded that the State Court Case be dismissed, contending that it was filed in violation of the discharge injunction entered in her bankruptcy.[6] Hanzel refused. As a result, Belding-Miller filed the current motion for sanctions. Cramer now argues that the debts described in the State Court Case were not discharged because they are based on fraud and because he did not receive formal notice of the bankruptcy. He also asserts that he had no knowledge of Belding-Miller's bankruptcy until after he sued her in state court.[7]

**Applicable Legal Standard**

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) (quotations and citation omitted). To that end, entry of the discharge injunction protects debtors from attempts by creditors to collect discharged debts. *See In re Cherry,* 247 B.R. 176, 182 (Bankr. E.D. Va. 2000). Section 524(a)(2) of the Bankruptcy Code explains that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to

---

[5] The Court is aware of cases that state the *Rooker-Feldman* doctrine is implicated when a former debtor asserts the bankruptcy discharge injunction as a defense in state court. *See, e.g., In re Toussaint*, 259 B.R. 96, 102-03 (Bankr. E.D.N.C. 2000). Those cases are distinguishable from the case at hand as a judgment was never entered by the state court. The *Rooker-Feldman* doctrine is not an issue in these proceedings because the Court is not being asked to review, and potentially reverse, a state court ruling.

[6] By this point, Belding-Miller had retained new bankruptcy counsel, David Badger, to represent her in the current proceedings.

[7] Cramer's original response to Belding-Miller's motion for sanctions indicated that he "was aware of Belding-Miller's personal bankruptcy." He recanted that statement in his amended response.

4

collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."

When faced with a request for sanctions against a creditor for attempting to collect a prepetition debt after entry of the discharge injunction, the threshold question is whether the debt was indeed discharged. If the debt at issue was not scheduled, its discharge depends on when the creditor had actual knowledge of the case. Under 11 U.S.C. § 523(a)(3), unless a creditor has actual knowledge of the bankruptcy, a debt is automatically excepted from discharge if the debt is not scheduled (A) in time for a creditor to file a proof of claim or (B) to file an adversary proceeding under 11 U.S.C. § 523(a)(2), (4), or (6). Put differently, debts owed to a creditor who has actual knowledge of a bankruptcy in time to participate in the case will be discharged even if the creditor was not listed on the bankruptcy petition.

If the debt the creditor sought to collect was discharged, most bankruptcy courts enforce the discharge injunction by treating violations as civil contempt of court. *In re Bock,* 297 B.R. 22, 29 (Bankr. W.D.N.C. 2002) (citations omitted). In fashioning a remedy, courts consider whether the creditor knew of the discharge injunction and whether the creditor intended the actions that violated the injunction. *In re Malone*, No. 10-31855, 2012 WL 162374, at *6 (Bankr. W.D.N.C. Jan. 19, 2012) (citing, *inter alia*, *In re Hardy*, 97 F.3d 1384, 1390 (11th Cir. 1996); *Cherry*, 247 B.R. at 187). Sanctions for willful violations of the discharge injunction can include actual damages, attorney's fees, and punitive damages. *Cherry*, 247 B.R. at 187. Specific intent is not required to find a willful violation of the discharge injunction; rather, courts must determine if the creditor committed an intentional act with knowledge of the injunction. *Id*. at 188.

5

**Findings of Fact and Conclusions of Law**

1. Belding-Miller's testimony was consistent and credible. Cramer's testimony, on the other hand, was marked by an inability to recall facts and details. His testimony was inconsistent, confusing, self-serving, and not credible.

2. The purported debts Cramer sought to collect in the State Court Case generally fall into two categories: (1) debts normally discharged in bankruptcy such as breach of contract and (2) those that would not be discharged pursuant to a successful action under 11 U.S.C. § 523(a)(2), (4), or (6) such as fraud and conversion. Both categories of debts were discharged in Belding-Miller's bankruptcy case:

    a. As to the former, the analysis is made easier by the fact that Belding-Miller's bankruptcy estate held no assets that could be administered for the benefit of her creditors. In bankruptcy vernacular, it was a "no asset case." Had there been assets available for distribution, a notice would have been sent to known creditors instructing them of the deadline to file a proof of claim to receive distributions from the estate. However, in a no asset case, a bar date is never set because distributions to creditors will never occur.

    b. The question thus raised for purposes of 11 U.S.C. § 523(a)(3)(A) is whether unscheduled debts are discharged if there was never a proof of claim deadline. In a no-asset Chapter 7 bankruptcy, because there is no bar date, there "never can be a time in such cases when it is too late to permit timely filing of a proof of claim." *In re Serge*, 285 B.R. 632, 634 (Bankr. M.D.N.C. 2002). Consequently, unscheduled debts falling under 11 U.S.C. § 523(a)(3)(A) in a no-asset case are discharged. *Id.*; *In re Cates*, 183 B.R. 723, 725 (Bankr.

6

   M.D.N.C. 1995). Meaning, the breach of contract claims in the State Court Case were discharged in Belding-Miller's bankruptcy.

  c. Because the remaining claims in the State Court Case including fraud, civil conspiracy, unfair and deceptive practices, and conversion appear to be debts described in 11 U.S.C. § 523(a)(2), (4), or (6), the analysis of whether these debts were discharged shifts to 11 U.S.C. § 523(a)(3)(B). The distinction between a no asset case and an asset case is immaterial to these claims because the deadline to object to dischargeability exists regardless of the solvency of the bankruptcy estate. The key inquiry under 11 U.S.C. § 523(a)(3)(B) is whether Cramer knew that Belding-Miller had sought bankruptcy relief in time to file a dischargeability action, which would have been June 19, 2015. *See* Fed. Rule Bankr. Proc. Rule 4007(c). He did.

  d. Belding-Miller informed Cramer she declared bankruptcy the month she filed. Their friendship continued post-petition, and she kept him "informed throughout the entire process." Consequently, Cramer did have actual knowledge of the bankruptcy before June 19, 2015.

  e. Because Cramer had actual knowledge of the bankruptcy in time to file an action under 11 U.S.C. § 523(a)(2), (4), or (6), any debts that could have arisen from Belding-Miller's alleged fraud, civil conspiracy, unfair and deceptive practices, and conversion were discharged.

3. Given the extensive conversations between Cramer and Belding-Miller, the Court finds that Cramer knew of the discharge injunction.

4. It is not clear that Hanzel knew of Belding-Miller's bankruptcy prior to Belding-Miller filing her answer in the State Court Case. Cramer testified that he informed his attorney of Belding-Miller's bankruptcy before they sued Belding-Miller; Hanzel testified otherwise.

5. Without resolving who was being truthful, the Court concludes that Cramer's role in filing the State Court Case violated the discharge injunction. *In re Bock*, 297 B.R. 22, 28 (Bankr. W.D.N.C. 2002) (finding that a creditor's prosecution of a state court action to collect a pre-petition debt was a "clear" violation of 11 U.S.C. § 524).

6. Cramer is a layman and may not have known the full implications of the discharge injunction when he consulted Hanzel about filing the State Court Case. However, Cramer and Hanzel had repeated notice that the debts at issue were discharged after they filed the State Court Case. Belding-Miller asserted the discharge in her answer to Cramer's complaint. Belding-Miller's bankruptcy counsel sent a warning letter in May 2017 that included citation of a bankruptcy decision instructive in this situation. Even with this notice, Cramer and Hanzel pressed on with the lawsuit, requiring Belding-Miller to reopen her bankruptcy and file the current motion to protect her discharge.

7. Cramer's and Hanzel's actions were willful in the sense that both intended the acts that violated the injunction. *Cherry*, 247 B.R. at 188.

8. Hanzel has forty-six years of experience as a trial attorney. His actions in ignoring the Bankruptcy Code and counsel's warnings were unjustifiable.

9. Hanzel's uncaring attitude toward these proceedings is even more troubling. At the trial, it appeared that Belding-Miller's request for sanctions had made little impact on

8

Hanzel's mindset or his understanding of the effect of the bankruptcy discharge injunction. Even after having been served with case law clearly showing the error in his ways, Hanzel was neither contrite nor apologetic. When asked whether he would proceed differently if this situation arose in the future, Hanzel remained steadfast that he wouldn't.

10. Sanctions are appropriate for Cramer's and Hanzel's actions from May 2017 (when Belding-Miller's bankruptcy counsel sent Hanzel the letter warning that continued prosecution of the State Court Case was a violation of the discharge injunction) through the conclusion of the sanctions hearings.

11. In addition to lost wages ($500) for attending two days of court, Belding-Miller has incurred reasonable attorney's fees (as determined by the Court's review of the billing records) and costs in excess of $15,000 in bringing her motion for sanctions.

Based upon the foregoing findings of fact and conclusions of law, it is **ORDERED**:

1. Cramer is sanctioned for his willful violations of the discharge injunction;

2. Hanzel and his firm, John F. Hanzel, P.A., are sanctioned for their willful violations of the discharge injunction;

3. Cramer, Hanzel, and John F. Hanzel, P.A. are ordered, jointly and severally, to pay within ninety days of entry of this order:

    a. Actual damages in the sum of $500 to Belding-Miller; and

    b. Belding-Miller's attorney's fees incurred in bringing this motion in the sum of $15,000 payable to David R. Badger, P.A.;

4. Cramer, Hanzel, and John F. Hanzel, P.A. shall provide counsel for Belding-Miller a file-stamped copy of the State Court Case dismissal within ten days from entry of this Order; and

5. If necessary, counsel for Belding-Miller may notice a compliance hearing.

**This Order has been signed electronically.**         **United States Bankruptcy Court**
**The judge's signature and the court's seal**
**appear at the top of the Order.**